REBA LEVIN *v.* SUN MORTGAGE COMPANY.
[No. 38, October Term, 1928.]

*Decided January 15th, 1929.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Louis Hollander* and *David Ash,* for the appellant.

*Milton B. Edelson* and *J. Kemp Bartlett, Jr.,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

On the 5th day of March, 1924, Wolf Levin was the owner, in fee simple, of the properties known as Nos. 2225 and 2251 Wilkens Avenue, in the City of Baltimore, and he also owned the leasehold property known as No. 1425 W. Baltimore Street. In addition to these properties he and his wife, Reba Levin, the appellant, owned Nos. 1429 and 1431 W. Baltimore Street by the entireties. There were, at such time, mortgages upon all of said property, which had been placed thereon by Wolf Levin and Reba Levin, his wife, and upon these properties there were due and owing at that time taxes, water rent, etc.

On the said 5th day of March, 1924, Wolf Levin and Reba Levin executed two mortgages on all the above mentioned properties, the first for the sum of $20,000, given to the Sun Mortgage Company, one of the appellees, payable two years after date with interest payable semi-annually, and at the time of the execution of the mortgage they signed and delivered to the mortgagee company their five promissory notes, one for $20,000, representing the principal indebtedness, payable in two years thereafter, and four others, payable in six, twelve, eighteen and twenty-four months for the interest upon said mortgage debt accruing at such times. The second mortgage was for the sum of $7,930 and was given to the State Building & Loan Association, of Baltimore City, another appellee. The first of said mortgages was thereafter assigned by the Sun Mortgage Company to the Union Trust Company the third appellee in this case.

On the 11th day of September, 1924, Wolf Levin and Reba Levin, his wife, conveyed the two Wilkins Avenue properties by deed of that date to Joseph Vigman. This was after they had on the 2nd day of July, 1924, executed in duplicate a contract of sale for said properties. In order to pass a title to the properties, free and clear of the encumbrances of the mortgages given to the Sun Mortgage Company and the State Building & Loan Association, the Union Trust Co., assignee of mortgage, and the State Building & Loan Association, did, on the 13th day of September, 1924, release

said properties from the lien of their respective mortgages, upon the payment to them, out of the proceeds of the sale of said properties, of the sums of $5,030 on the mortgage given to the Sun Mortgage Company, and $1,507.50 on the mortgage given the State Building & Loan Association.

Thereafter, on July 31st, 1925, the property known as 1425 W. Baltimore Street was released from the operation and effect of the said two mortgages, upon the payment, it is said, of a substantial amount thereon. The amount required to be paid upon said mortgages for the release of the properties mentioned was determined by a re-inspection and re-appraisement of the properties. The lien of the remainder of the mortgage thereafter rested alone upon the two West Baltimore Street properties owned by Reba Levin and her husband by the entireties. Thereafter the husband Wolf Levin died and Reba Levin, the wife, became sole owner of the last mentioned properties, subject to the liens against them.

On the 5th day of March, 1926, after the death of her husband, Reba Levin filed her first bill of complaint, in which she alleged the facts we have stated, and the further facts that the stocks of the two corporations, the Sun Mortgage Company and the State Building & Loan Association, were practically owned and the companies managed by the same people; and that the said Sun Mortgage Company, in the ordinary course of its business, made loans on first mortgages only, and immediately assigned them unto the Union Trust Company of Maryland, for the purpose of financing such loans, and the mortgage in this case given to the Sun Mortgage Company was so assigned to the Union Trust Company. It further alleged that the releases both of the Union Trust Company as assignee of mortgage, and the State Building & Loan Association, were made without the knowledge and consent of the appellant Reba Levin, and were, as alleged, "wrongful, improper, unlawful and inequitable and enured to the detriment of the appellant."

The bill further alleged that neither of the aforesaid mortgages were then in default, but alleged that "the State Build-

ing & Loan Association contends that the second mortgage, aforesaid, is in default, and is demanding some arrangement or settlement in relation to said second mortgage, at this time, under peril of attempted foreclosure proceedings therein."

The bill then charges that the appellant "is entitled to be credited with and to have said mortgages respectively charged with the full value of the properties released, as aforesaid, respectively, as of the time of the execution of said respective releases." It then concluded with the following prayers:

*First.* That the defendants (appellees) be restrained from foreclosing or attempting to foreclose said mortgages respectively, until after an accounting of the amounts actually remaining due under said mortgages, and an opportunity given to the plaintiff (appellant), to pay the same.

*Second.* That the Sun Mortgage Company, the State Building & Loan Association, and each of them, may be made to account unto the plaintiff in the premises.

*Third.* That she may be credited on said mortgage accounts respectively, with the full value of the properties released, as of the time of the execution of said releases respectively.

*Fourth.* That she may have such other and further relief as her case may require.

To this bill, the affidavit of the plaintiff was attached, and upon the bill a conditional order was passed on the 5th day of March, 1926.

On the 13th day of March, each of the defendants filed a demurrer to the bill, all of which were sustained by the court, with leave to the plaintiff to file an amended bill.

On May 3rd, 1926, she filed her amended bill, which contains the allegations of the first bill, but goes more extensively into the question as to the relations of the defendant companies, alleging agency, and for the first time it is alleged, "That for a some time prior to and on the 5th day of March, 1924, your oratrix was physically and mentally ill, and in no condition to make a valid deed or contract, and that on, or about, the 25th day of May, 1925, said Wolf Levin insti-

tuted proceedings *de lunatico inquirendo* against your oratrix in the Circuit Court No. 2 of Baltimore City; that for some years prior to said proceeding said Wolf Levin made repeated efforts to rid himself of your oratrix; that during said efforts said Wolf Levin determined to saddle your oratrix's property with the obligation to pay the mortgage debts herein referred to; that Louis S. Ashman, Esquire, president and general counsel of the Sun Mortgage Company and chairman of the executive board and general counsel of the State Building and Loan Association, directed and managed the matters of the releases herein complained of, and that at the time of so doing, and at the time of the release of said mortgages, said Louis S. Ashman of said mortgage companies had full knowledge of the matters alleged in this paragraph."

The prayers of the amended bill are practically the same as those of the original bill, and attached thereto we also find the affidavit of the appellant.

An answer was filed to the bill, and considerable testimony was taken, at the conclusion of which the court dismissed the bill, with costs to the defendant. It was from that decree that the appeal in this case was taken.

There are two questions presented by this appeal. The first being one of fact, whether the appellant had the mental capacity to make a deed or contract at the time of the execution of the mortgages by her and her husband to the Sun Mortgage Company and the State Building & Loan Association, respectively, and the second, a question of law, whether the partial releases of the mortgages mentioned, made in the manner stated, worked such a wrong to the appellant as to entitle her to the relief sought.

The mortgages referred to were executed by the appellant in the Hebrew Hospital, in the City of Baltimore, where she was then a patient.

Her sister, Bertha Libowitz, when asked as to her condition when in the hospital, answered "She (her sister) knew practically nothing and you could not make her understand what you were speaking and she was very weak * * * she had to be practically fed and everything, she had to be helped to do

everything she did." And when asked if in March, 1924, her sister was capable of attending to any business or making any agreement, she said: "Well, she really could not understand anything, but she was very obedient. If she was told to do anything she would do it, whether she understood it or not, we did not know." And when asked "What is her condition at the present time?" she said "She is still in the same condition," and was in this condition on the 30th day of September, 1924, and the 31st day of July, 1925.

Dora M. Libowitz, her mother, testified that she was at the hospital at the time the mortgages were executed, and when asked what took place on that occasion, she said, "While I was sitting there feeding Reba, her husband came in with another man, a man carrying some papers in his hand, and he (her husband) walked over to Reba and told her to sit up, but she did not sit up, so * * * he took her by the hand and said 'Now sign this,' and she did not do it, so he took her by the hand and he held the pen and kept on writing. I wanted to know what it was all about, and he told me to keep quiet, I had no business in it." She said the man asked her daughter no questions. "Wolf took her hand and signed what he wanted to sign on the paper, and then the man took the papers and went away." She further testified that her daughter suffered from nervous trouble, which, as she says, "amounted to insanity."

Dr. Myer A. Weinberg, a general practioner of medicine, testified that he saw the appellant at her home in March, 1924. He afterwards saw her while at the Hebrew Hospital, where he had occasion to examine her and frequently saw her while there. He was then asked what her mental condition was on March 5th, 1924; he replied "Well, if we speak of the condition the whole time she was over there, but not any one particular day, it would be difficult for me to remember a day. Her mental condition was certainly not normal, extremely far from normal, the whole time she was in the hospital. She was very nervous, she was thoroughly unreliable in her actions, that is, in her answers and questions and her general condition." He was then asked "Your opinion

is that she was not mentally competent to make a valid deed or contract, is that it? A. I would say unqualifiedly yes, she was not." A motion was made to strike out this testimony, but the motion was overruled. There is no evidence that Dr. Weinberg had ever attended the appellant, or knew of her condition, until about March 1st, 1924, when he was called in and he advised her to see a nerve specialist. He speaks of an examination of her, without stating its character or result, and when asked for his opinion of her mental condition on March 5th, 1924, he made the answer above stated. He was then asked the leading and objectionable question, "your opinion is that she was not mentally competent to make a valid deed or contract?" His answer thereto was, "she was not." This evidence is not referred to by the lower court in the opinion filed, summing up the evidence, and it is evident that he gave little or no weight to it.

Dr. Gillis, an alienist, was also placed upon the stand as a witness for the plaintiff. He testified that he never saw the plaintiff earlier than February 26th, 1925, and examined her on the following day, the 27th, nearly a year after the execution of the mortgages and several months after the execution of the first releases. In speaking of her condition he said she had *dementia praecox,* a progressive mental disorder, and there is considerable mental depreciation or deterioration at the present time (February, 1928). She answers questions in a silly, foolish way. She is rather inclined to be untidy about herself and habits, and her memory is quite uncertain. She has some delusionary ideas. She sits gazing forward without moving for a long period, sometimes with a silly look on her face, and in many other ways she shows very marked mental deterioration which has been going on for the *last two years,* I think.

In contradiction of the evidence in support of the mental incapacity of the plaintiff, we have the testimony of a number of witnesses.

Mr. William Edgar Porter, an attorney and notary public, and one who, at the time of the execution of the mortgages on March 5th, 1924, was employed in the office of Mr. Ash-

man, handling title work for him, had charge of the execution and acknowledgment of these mortgages. He testified that he took the acknowledgment of both mortgages, that they were executed by the appellant while she was in the Hebrew Hospital on Monument Street. Mr. Samuelson, who was also employed in Mr. Ashman's office, went with him to the hospital. Upon reaching there, he stopped at the office to inquire where Mrs. Levin's room was, and had one of the young ladies go with them to her room that she might identify Mrs. Levin. He said Mrs. Levin at the time was reclining in bed. "I called her attention to the fact that we were over to have the papers executed. She seemed to know that they were to be executed. I told her there was a mortgage of so much money to be executed to the Sun Mortgage Company for the first mortgage and a mortgage of so much money to the State Building & Loan Association * * *. She seemed to understand thoroughly * * * and executed both mortgages sitting in bed * * * with a fountain pen which was handed her at the time." He was then asked, "Did her husband have anything to do with signing her name to it?" And he said, "The only thing that her husband had to do with her signing the paper was probably to assist her bodily in raising from the bed a trifle." He did not remember specifically the conversation or all the details about the transaction, as four years had elapsed, except "that I told Mrs. Levin of the purpose of my mission and the paper she was to execute and she executed them, and I had her acknowledge the mortgages." In addition to signing the mortgages, she also endorsed two checks for the face amount of the mortgages respectively, also the principal note and the interest notes for the first mortgage. In addition to that, she signed an agreement authorizing the payment of certain expenses in monthly or quarterly installments to take care of the taxes and interest on the property, also a letter addressed to Mr. Ashman, as attorney, authorizing him to pay out of the proceeds of the loan a certain amount of commissions. She signed her name "perhaps a dozen times." He was then asked by the court, "In any of those signatures on any of

those papers did her husband physically take the pen that she was holding or hold her hand and guide her hand for her? A. No, sir; absolutely not." In taking her acknowledgment of the mortgage she acknowledged it to be "her voluntary act and deed."

Herman Samuelson testified that he went to the Hebrew Hospital with Mr. Porter and to the room of Mrs. Levin, where they found her with her husband, Mr. Levin, and a lady who was introduced to them as Mrs. Levin's mother. "Mr. Porter explained to Mrs. Levin our mission, told her we had to have two mortgages signed, and Mr. Levin was there and as I recall she seemed to know something about the transaction. I think at the time she said 'yes, Mr. Ashman was out to see the property or spoke to her a few days before.' She was lying in the bed and it was necessary for her to be raised a bit and Mr. Levin raised the mattress or spring so that she could get up a bit to sign the mortgages and other papers, and she did sign the mortgages and all the papers, and seemed to know what it was all about." After the mortgages were signed, she was asked by Mr. Porter if it was her act and deed, and "she said yes on both papers." She also signed a letter and endorsed the checks. The mortgages in question were those signed by her.

Adam G. Geyer, an official of the title company who represented the purchaser in the sale and conveyance of the Wilkens Avenue properties by Levin and wife to Vigman, testified that he was present at the transfer of the property and made the settlement. There were at the time duplicate contracts of sale exhibited, signed by Levin and his wife. The title company examined the titles and prepared a deed to be executed by the appellant and her husband. This deed was executed by them in his presence by both Levin and his wife, on the 11th day of September, 1924, at his office. When asked by the court if Mrs. Levin required any assistance in signing the paper, he said "she did not." The deed was delivered to him, but was not recorded until the mortgages of the Sun Mortgage Company and the State Building & Loan Association were first released. He was then asked

by the court, "Can you tell us anything about her conduct and demeanor during the settlement." He said, "she was perfectly normal, so far as I could see * * * if there was anything that would have excited my supicion. I would never have taken her acknowledgment."

Photostatic copies of the appellant's name admittedly signed by her were filed as exhibits in the case. These were compared with the signature of the appellant to the mortgages, above mentioned, and a great similarity was shown to exist between them, with nothing to indicate that her hand was in any way guided or controlled by any one in signing the mortgages, for had it been so guided or controlled, that similarity would never have existed, as there could have been no attempt made at the time to imitate her handwriting. This being so, the evidence of her mother was entitled to little or no weight.

Another fact worthy of consideration is that, in the first bill filed, nothing was said of the alleged insanity of the appellant, or of her incapacity to make a deed or contract, and it was not until the second or amended bill was filed, after the original bill had been held bad, that such fact was alleged. She not only made her affidavit to the first of these bills, but to the second also, in which she was alleged to have been incompetent to make a deed or contract. She was permitted by her counsel to make an affidavit as to the facts therein contained and to institute the suit in her own name and, when the decision was against her, an appeal in her name was taken to this court, thereby subjecting her to the possible costs of such appeal.

The judge, sitting in open court, saw and heard the witnesses testify and observed their demeanor while upon the stand, and was in a better position than we are to judge the truth of the witnesses and the weight of their evidence, and we, therefore, do not feel warranted, upon the facts disclosed by the record, in saying that the conclusion reached by him was erroneous.

In addition to this, if her contention, or the contention of those representing her, was true, she still was not materially

injured by the execution or creation of the said mortgages, inasmuch as the money borrowed thereon was to be applied, and was applied, with the exception of the costs and expenses of said two new mortgages, to the payment of taxes and other charges upon the land, and to the payment of mortgages then resting as liens upon said properties, which had been executed by her and her husband to secure their joint indebtedness, as to the correctness of which there is no contention.

We will now consider the second point in the case.

The mortgages in question were, as shown by the mortgages themselves, given to secure the joint indebtedness of the husband and wife, and there is nothing in the evidence showing that such statement therein contained is not true. The properties embraced within the mortgages were the sole properties of the husband, with the exception of Nos. 1429 and 1431 W. Baltimore Street, which were held by the husband and wife as tenants by the entireties. The complaint made is that, upon the sale of the property owned exclusively by the husband, the same should not have been released from the lien of the mortgage, although a substantial part of the proceeds arising therefrom was paid upon the mortgages, reducing the amount thereof to the extent of such payment. In these properties, the wife, one of the joint debtors, had only an inchoate right of dower, or had only such interest as was incident to her marriage relation to the owner of the properties. In the other properties, the husband and wife had a like interest. If she survived him, she became the sole owner of the properties; if he survived her, he became the sole owner of the properties, and thus we fail to see the wrong complained of, by allowing this property, in which they were alike interested, to remain liable for the remainder of the joint indebtedness secured by the mortgages.

The appellant's counsel in their brief attempt to explain just how the appellant was wronged by the conduct of the parties in releasing the properties mentioned, leaving the remainder of the mortgage indebtedness to rest alone upon

the properties held by the husband and wife as tenants by the entireties. He says: "The contract of a co-surety cannot be materially varied, without the co-surety's knowledge, consent or approbation, without releasing the co-surety and the co-surety's properties from the entire obligation. If that view be correct, then, of course, the properties here at issue, to wit: The properties surviving by the entireties are absolved from any lien of the mortgage debt."

It is not shown by the mortgage, or by the evidence in the case, that the wife was surety for the husband, as it appears it was their joint indebtedness, and we cannot conceive how this principle of law can be applicable to the case before us. We may add, however, that if this statement of law applied, the appellant would be defeated in the attempt to obtain the relief sought, because there is nothing in this case showing that the releases complained of were made without her knowledge and consent. The only evidence found in the record on this phase of the case, and it is uncontradicted, is that of Mr. Ashman, president of both the Sun Mortgage Company and the State Building & Loan Association.

Mr. Ashman had several conversations with Mr. Levin in relation to these releases. On one of these occasions, at least, his wife was present. It seems that, out of the proceeds of the sale of the property to be released, Mr. Levin wished to apply upon the mortgage debt a sum less than that which the mortgagees were disposed to accept. The conversation, at which the wife was present, was at their home in the rear of their store on West Baltimore Street. Mr. Ashman testified that Mr. Levin invited him back in that part of the building in which they lived. He went back with him and "Mrs. Levin was there and they both began to plead with me that the company ought to accept their consideration or conception of what was a fair partial release. Mr. Levin * * * began to talk to me what his figures were, and I said that we could not go by his figures, that we would have to go by an appraisement, and Mrs. Levin joined in the pleading, and began telling me, if we don't help them out and give them the releases as they want to, they cannot go through

with the transaction, and if they do not they will suffer certain losses. * * * She was supporting her husband's contention that we adopt his figure of releases. He had a lower figure than we finally approved as an appraisal committee. He wanted that to go through. * * * She joined him and began to say to me that your company ought to be nice to us in order to help us out, and it is going to help us a lot if we put the thing through the way they wanted it put through, and they both repeated once or twice their position in the matter." He was then asked "You finally charged them more for a partial release than they wanted to pay?" and he answered "Yes, we had to do our duty. We were simply officers and we followed our opinions and appraisals of real estate and gave them the benefit of everything that they could get fairly and squarely under the circumstances."

In the loan made to the appellant and her husband by the Sun Mortgage Company there was a charge for brokerage of $1,317.20. There is no reference to it in the bill, nor in the brief of either of the parties, though it appears in the evidence, and is referred to in the opinion of the court, in connection with the fact whether or not it was usury. The court, however, in dealing with that, reached no decision, but left it to be disposed of when the proceeds under the mortgage sales shall be distributed.

We will, therefore, not decide this question, as it is not presented to us on this appeal, but will leave it to the further action of the lower court, when it comes up in the manner stated by the learned judge below.

As we find no errors committed by the lower court in the passage of the decree appealed from, the decree dismissing the bill will be affirmed.

*Decree affirmed, with costs.*